NO. 12-02-00217-CV



IN THE COURT OF APPEALS



TWELFTH COURT OF APPEALS DISTRICT


 

TYLER, TEXAS


 


§
 APPEAL FROM THE 


THE STATE OF TEXAS FOR THE 

BEST INTEREST OF
§
 COUNTY COURT OF

B.S.


§
 CHEROKEE COUNTY, TEXAS






MEMORANDUM OPINION


 Appellant B.S. appeals from an order of commitment for temporary inpatient mental health
services. After a hearing without a jury, the trial court ordered B.S. committed to Terrell State
Hospital for a period not to exceed ninety days. In five issues, B.S. asserts the evidence is legally
and factually insufficient to support the order of commitment and his constitutional rights to due
process and equal protection have been violated. We reverse and render. 


Background

 On July 17, 2002, an application for court-ordered temporary mental health services was filed
requesting the court commit B.S. to Terrell State Hospital for a period not to exceed ninety days. 
The application was supported by a certificate of medical examination for mental illness, prepared
by a physician, Dr. Wanda Michaels, who had examined B.S. on July 17. Dr. Michaels diagnosed
B.S. as having Bipolar I Disorder. She found that B.S. is mentally ill and likely to cause serious
harm to himself. She also found he is suffering severe and abnormal mental, emotional or physical
distress, is experiencing substantial mental or physical deterioration of his ability to function
independently, which is exhibited by his inability to provide for his basic needs, and is unable to
make a rational and informed decision as to whether or not to submit to treatment. Dr. Michaels
reached these conclusions because, on July 17, B.S. stated he would not take his medications because
it is "taking the name of God in vain." B.S. shaves only once a year "on the Day of Atonement"
because the "beard is sacred." On July 1, 2002, B.S. said that a "psychiatrist said I was crazy as I
was fighting for God." On June 24, 2002, B.S. said bald people are homosexuals. Also on July 17,
B.S. exhibited poor personal hygiene and had a very long beard. B.S. refused to take medications
prescribed for his high blood pressure despite knowledge of the dangers of unchecked hypertension. 

 On July 12, 2002, B.S. was examined by Dr. Cira Jane De Leon who then also prepared a
certificate of medical examination for mental illness. Dr. De Leon stated that B.S. is hyper-religious
with grandiose and delusional thoughts. His behavior and attitude is at times hostile and bizarre,
while at other times he is calm and appears somewhat disphoric with positive lability. His insight
and judgment are poor and he has a history of aggressiveness. Dr. De Leon diagnosed B.S. with
psychosis NOS and indicated that B.S. is mentally ill and likely to cause serious harm to himself and
others. She further determined that B.S. is suffering severe and abnormal mental, emotional or
physical distress, is experiencing substantial mental or physical deterioration of his ability to function
independently, which is exhibited by his inability to provide for his basic needs, and he is unable to
make a rational and informed decision as to whether to submit to treatment. She based these
conclusions on B.S.'s statements and behavior. On or about June 19, 2002, June 21, 2002, and July
8, 2002, B.S. screamed and preached at others and made the following statements: "I refuse to
share...God has hair but Satan doesn't." "I am not crazy...Jesus was strange too and accused of being
mentally ill!" "I am a child of God...you all are followers of the Devil." On or about June 19, 2002
through July 12, 2002, B.S., who has a history of aggressiveness, demonstrated loud, pressured
speech, anger, irritability, oppositional behavior, grandiose delusions and hyper-religiosity. His
mood had been depressed, his affect had been anxious, and his insight and judgment had been
impaired. He had grown his hair and beard and refused to shave or bathe.

 Dr. Michaels testified at the hearing, first restating her diagnosis that B.S. is mentally ill and
suffers from Bipolar I Disorder. She explained that, based on her examination of B.S. and a review
of his medical records, she determined that as a result of his mental illness he is likely to cause
serious harm to himself, and is suffering severe and abnormal mental, emotional, or physical distress,
is experiencing substantial mental or physical deterioration of his ability to function independently,
which is exhibited by his inability to provide for his basic needs, and is unable to make a rational,
informed decision as to whether to submit to treatment. Dr. Michaels explained that B.S. was
referred by another hospital on July 12, 2002. He had been hyper-religious, saying he had direct
communications with God, staying up late at night preaching to other patients, meditating, and
chanting loudly. He denied he is mentally ill. He was irritable and suspicious and refused to cut his
hair or shave because the beard is sacred. He said he would only shave or cut his hair one day of the
year, the Day of Atonement. He did not take medication because he believes that by taking
medication you take the name of God in vain. The doctor explained that B.S. has very high blood
pressure so it is dangerous for him if he does not take his medicine. She thought B.S. understood
the danger. B.S. had very poor hygiene and had not been taking care of himself. Further, he was not
able to make a rational and informed decision about his health care because of his delusional beliefs.

 On cross-examination, Dr. Michaels indicated that B.S.'s refusal to take his medication was
based on his religious beliefs and the failure to take his medication could kill him. She agreed that
B.S.'s refusal to shave could fall within his religious beliefs and that being a preacher is not grounds
for involuntary mental health treatment.

 On redirect, Dr. Michaels testified that B.S. is delusional and his delusions, which are
preventing him from taking his medications, are detrimental to his well-being. Therefore, he is likely
to cause harm to himself. His refusal to accept medications evidences a continuing pattern of
behavior that tends to confirm the likelihood that B.S. will cause serious harm to himself.

 B.S. testified in his own behalf. He explained that he is a member of the Philadelphia Church
of God which teaches that Jesus was the great physician. Therefore, by taking medication one breaks
the third commandment by taking God's name in vain. People should turn to God, not to man. The
only way to communicate with God is through his word, which is the Bible. He said it would violate
his religious tenets if he harmed himself. However, even knowing he has hypertension and asthma,
it is against his religion to take any kind of medication. He admitted to preaching to other patients
because God tells us to speak only the word of God. God gave him a song to sing of every word of
the Bible and he sings that song. B.S. explained that God said to let your every word be a praise to
God. Appellant also testified that the beard is a sacred thing. The Day of Atonement is the day to
humble yourself and to be at one with God. He explained that hurting himself or anyone else "would
be totally against God" and it would be taking the name of God in vain. He said he had been
dressing himself for seven years in prison and could take baths without assistance or prompting. He
explained that he had not been well-groomed when he saw the doctor because prison officials
transferred him without allowing him to take his comb and toothbrush with him. He said he speaks
loudly, which sounds aggressive, because he was taught to do so as a child and because he is a little
hard of hearing. B.S. said that if released he would go to Edmund, Oklahoma, where the
headquarters of the Philadelphia Church of God is located. He also said he wanted to help take care
of his elderly parents, who live near Dallas, Texas.

 The trial court entered an order for temporary inpatient mental health services after
determining that the evidence supports the allegations that B.S. is mentally ill and that he is likely
to cause serious harm to himself, or will, if not treated, continue to suffer severe and abnormal
mental, emotional, or physical distress, and will continue to experience deterioration of his ability
to function independently and is unable to make a rational and informed decision as to whether or
not to submit to treatment. The court ordered B.S. committed to Terrell State Hospital for a period
not to exceed ninety days.


Sufficiency of the Evidence 

 In his first issue, B.S. asserts there is no evidence, or in the alternative, factually insufficient
evidence to support the order of commitment. He contends that Dr. Michaels' testimony must be
disregarded because it failed to provide the necessary factual basis in support thereof. Therefore, he
argues, the State failed to meet its evidentiary burden under the statute in order to justify involuntary
commitment. 

Applicable Law

 In reviewing no evidence points of error, the reviewing court must consider only the evidence
and inferences tending to support the trial court's finding, disregarding all contrary evidence and
inferences. Wal-Mart Stores, Inc. v. Gonzalez, 968 S.W.2d 934, 936 (Tex. 1998). If there is any
evidence of probative force to support the finding, the no evidence issue must be overruled and the
finding upheld. ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997). When the
evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or
suspicion of its existence, no more than a scintilla of evidence exists and, in legal effect, is no
evidence. Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983). However, if the evidence
supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of
a vital fact, some evidence or, in other words, more than a scintilla of evidence exists. Id.

 The trial judge may order a proposed patient to receive court-ordered temporary inpatient
mental health services if the judge or jury finds, from clear and convincing evidence, that:


 (1) the proposed patient is mentally ill; and 


 (2) as a result of that mental illness the proposed patient:


 (A) is likely to cause serious harm to himself; 


 (B) is likely to cause serious harm to others; or 


 (C) is: 

 (i) suffering severe and abnormal mental, emotional, or physical distress; 


 (ii) experiencing substantial mental or physical deterioration of
the proposed patient's ability to function independently, which
is exhibited by the proposed patient's inability, except for
reasons of indigence, to provide for the proposed patient's basic
needs, including food, clothing, health, or safety; and 


 (iii) unable to make a rational and informed decision as to whether or not
to submit to treatment. 


Tex. Health & Safety Code Ann. § 574.034(a) (Vernon Supp. 2003). To be clear and convincing
under this statute, the evidence must include expert testimony and, unless waived, evidence of a
recent overt act or a continuing pattern of behavior that tends to confirm either the likelihood of
serious harm to the proposed patient or others, or the proposed patient's distress and the deterioration
of his ability to function. Tex. Health & Safety Code Ann. § 574.034(d) (Vernon Supp. 2003). 
Clear and convincing evidence means the measure or degree of proof which will produce in the mind
of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be
established. State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979).



Discussion

 The trial court found that, in addition to being mentally ill, B.S. met two of the three possible
criteria necessary for commitment as set out in Section 574.034(a)(2)(A) and (C). With regard to
the court's finding that B.S. is likely to cause serious harm to himself, the State provided expert
testimony explaining that B.S. is mentally ill and describing what the State presented as a recent
overt act by B.S. Dr. Michaels explained that B.S. is delusional and his delusions, which prevent
him from taking his medication, are detrimental to his well-being. The doctor testified that B.S. has
very high blood pressure, "in the range of stroke or heart attack"; therefore, not taking his medicine
is dangerous for him. Specifically, B.S. could have a stroke if he does not take his medications. The
State argues that, because B.S. suffers from hypertension which requires medication, the doctor's
expert testimony of his refusal to take his medication is some evidence tending to confirm the
likelihood of serious harm to himself. We disagree. 

 Other courts have determined that an individual's refusal to take medication does not
constitute an overt act as contemplated by the Health and Safety Code. See G.H. v. State, 96 S.W.3d
629, 635 (Tex. App.-Houston [1st Dist.] 2002, no pet.) (Mere evidence of a patient's mental illness
and refusal to take medication is not sufficient to sustain the State's statutory burden.); Johnstone
v. State, 961 S.W.2d 385, 389 (Tex. App.-Houston [1st Dist.] 1997, no writ) (Where patient refused
to take medication, the State failed to prove evidence of overt act.); Broussard v. State, 827 S.W.2d
619, 621-22 (Tex. App.-Corpus Christi 1992, no pet.) (Patient's repeated refusal to take her
medication did not constitute an overt act.). The statutory requirements for an involuntary
commitment are strict because an involuntary commitment is a drastic measure. In re C.O., 65
S.W.3d 175, 182 (Tex. App.-Tyler 2001, no pet.). To justify depriving an individual of his liberty,
more than potential harm is necessary. Id. Evidence that B.S. refuses to take medicine prescribed
to control his hypertension and that he might have a stroke does not meet the State's burden to prove
an overt act tending to confirm that B.S. is likely to cause serious harm to himself.

 The trial court also found that, if not treated, B.S. will continue to suffer severe and abnormal
mental, emotional, or physical distress, his ability to function independently will continue to
deteriorate, and he is unable to make a rational and informed decision as to whether to submit to
treatment. In support of these findings, the State relies on the doctors' testimony describing B.S.'s
behavior. B.S. is delusional and exhibits symptoms of mania. While sometimes calm, B.S.'s
behavior and attitude is at times hostile and bizarre and he has a history of aggressiveness. He is
suspicious of others, screams at those around him, and exhibits anger, irritability and oppositional
behavior. Prior to the trial, he had very poor hygiene and had not been taking care of himself. The
State argues that this evidence indicates both an overt act and a continuing pattern of behavior
evidencing severe and abnormal mental, emotional, or physical distress. We disagree. This is
merely evidence of B.S.'s mental illness. While the doctors described B.S.'s state of mind, this does
not constitute evidence of an overt act or continuing pattern of behavior that demonstrates distress
or tends to confirm a substantial deterioration of B.S.'s ability to function independently to provide
for his basic needs. See Tex. Health & Safety Code Ann. § 574.034(d)(2); G.H., 96 S.W.3d at
634; In re Breeden, 4 S.W.3d 782, 788-89 (Tex. App.-San Antonio 1999, no pet.); Johnstone, 961
S.W.2d at 389-90; Broussard, 827 S.W.2d at 622. The evidence is not legally sufficient to support
the trial court's order. See Kindred, 650 S.W.2d at 63. We sustain B.S.'s first issue.


Conclusion

 The evidence is not legally sufficient to support the trial court's order for temporary inpatient
mental health services. We need not reach B.S.'s factual insufficiency or constitutional complaints. 
See Tex. R. App. P. 47.1. We reverse the trial court's order and render judgment denying the State's
application for temporary mental health services.


 JAMES T. WORTHEN 

 Chief Justice



Opinion delivered May 30, 2003.

Panel consisted of Worthen, C.J. and Griffith, J.




(PUBLISH)